<div style="text-align:center">

# In the United States Court of Federal Claims

No. 13-764C
(Filed: June 26, 2014)

</div>

```
*************************************
NATIONAL AIR CARGO GROUP, INC.,      *
d/b/a NATIONAL AIRLINES et al.,      *
                                     *
              Plaintiffs,            *    Motion to Dismiss; Aviation Insurance, 49
                                     *    U.S.C. ch. 443; Jurisdiction; Joinder;
v.                                   *    Declaratory Judgment Act
                                     *
THE UNITED STATES,                   *
                                     *
              Defendant.             *
*************************************
```

Jessica C. Abrahams and Mark A. Dombroff, Washington, DC, for plaintiffs.

Sheryl L. Floyd and Barbara E. Thomas, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

      Plaintiffs in this action seek payment under an insurance policy issued by the government. Defendant moves to dismiss the claims of one of the plaintiffs for lack of jurisdiction pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"). Because some of defendant's arguments touch upon the merits of one of those claims, the court treats that merits discussion as a motion to dismiss for failure to state a claim upon which the court could grant relief pursuant to RCFC 12(b)(6). For the reasons set forth below, the court grants in part and denies in part defendant's motion.

### I. BACKGROUND

#### A. Aviation Insurance

      This case concerns an insurance policy issued by the Federal Aviation Administration ("FAA") as part of its aviation insurance program. Under this program, which is set forth in chapter 443 of title 49 of the United States Code ("chapter 443"), the FAA "may provide insurance and reinsurance against loss or damage arising out of any risk from the operation of an" aircraft if the FAA "decides that the insurance cannot be obtained on reasonable terms from

an insurance carrier," 49 U.S.C. § 44302(a) (2006 & Supp. V 2012), and if the President has determined that "the continued operation of the . . . aircraft to be insured or reinsured is necessary in the interest of air commerce or national security or to carry out the foreign policy of the United States Government," id. § 44302(c).  The FAA may waive the premium for this insurance so long as the Secretary of Defense or another designated official agrees to indemnify the FAA "against all losses covered by the insurance."  Id. § 44305(b).

## B. Factual and Procedural History

On April 29, 2013, an aircraft operated by plaintiff National Air Cargo Group, Inc. d/b/a National Airlines ("National Air Cargo") crashed at Bagram Air Base, Afghanistan.  At the time of the crash, the aircraft was transporting military vehicles and other military cargo pursuant to a contract with the United States Transportation Command ("USTRANSCOM").  The crash resulted in the deaths of the seven individuals on board the flight and the total loss of the aircraft.

As required by its contract with USTRANSCOM, National Air Cargo was a carrier in good standing participating in the Civil Reserve Air Fleet.  Pursuant to its Civil Reserve Air Fleet contract, National Air Cargo was required to apply for nonpremium aviation insurance from the FAA.  National Air Cargo complied with this provision, and on September 28, 2011, the FAA issued National Air Cargo a nonpremium hull and liability war risk insurance policy ("nonpremium war risk policy").  This policy covered physical loss or damage to the aircraft resulting from a war risk occurrence, up to $40,000,000.

In letters dated May 30, 2013, and June 6, 2013, National Air Cargo notified the FAA that it had a claim under the nonpremium war risk policy arising from the crash at Bagram Air Base.  The FAA denied National Air Cargo's claim on June 19, 2013.  In the meantime, National Air Cargo and its lenders submitted a claim for their loss under a separate insurance policy issued by plaintiff Commerce and Industry Insurance Company ("Commerce"), which provided coverage for physical damage to the aircraft.  Commerce ultimately paid National Air Cargo and its lenders $42,153,003 to settle their claim for the loss of the aircraft.  Under the terms of the Commerce policy, Commerce is subrogated to National Air Cargo's rights of recovery against the FAA.

As a result of the FAA's denial of National Air Cargo's claim under the nonpremium war risk policy, National Air Cargo and Commerce filed suit in the United States Court of Federal Claims ("Court of Federal Claims").  Their complaint contains three counts.  In the first count, captioned "Breach of Contract – National Air Cargo," National Air Cargo alleges that the FAA's failure to pay it for the loss of its aircraft constitutes a breach of the nonpremium war risk policy.  In the second count, captioned "Breach of Contract – Commerce and Industry Insurance Company," Commerce also alleges, in its role as subrogee, that the FAA breached the nonpremium war risk policy by failing to pay for the loss of the aircraft.  In the third count, plaintiffs seek a declaratory judgment.  Plaintiffs collectively request damages of no more than

$45,000,000, interest, attorney's fees and costs, and a declaration of the FAA's obligations under the nonpremium war risk policy.

In response to plaintiffs' complaint, defendant filed a partial answer and a motion to dismiss. With the latter submission, defendant seeks the dismissal of the claims asserted by Commerce for lack of jurisdiction. The motion has been fully briefed, and the court heard argument on June 25, 2014.

## II.  DISCUSSION

### A.  RCFC 12(b)(1) Motions to Dismiss

Defendant moves to dismiss Commerce's claims for lack of jurisdiction pursuant to RCFC 12(b)(1). In ruling on a motion to dismiss, the court assumes that the allegations in the complaint are true and construes those allegations in the plaintiff's favor. Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995). However, the plaintiff bears the burden of proving, by a preponderance of the evidence, that the court possesses subject matter jurisdiction. McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988). If the court finds that it lacks subject matter jurisdiction over a claim, RCFC 12(h)(3) requires the court to dismiss that claim.

### B.  Subject Matter Jurisdiction

The ability of the Court of Federal Claims to hear and decide suits against the United States is limited. "The United States, as sovereign, is immune from suit save as it consents to be sued." United States v. Sherwood, 312 U.S. 584, 586 (1941). The waiver of immunity "cannot be implied but must be unequivocally expressed." United States v. King, 395 U.S. 1, 4 (1969).

The Tucker Act, the principal statute governing the jurisdiction of this court, waives sovereign immunity for claims against the United States, not sounding in tort, that are founded upon the Constitution, a federal statute or regulation, or an express or implied contract with the United States. 28 U.S.C. § 1491(a)(1) (2012). However, the Tucker Act is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages." United States v. Testan, 424 U.S. 392, 398 (1976). Instead, the substantive right must appear in another source of law, such as a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States." Loveladies Harbor, Inc. v. United States, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc). In their complaint, plaintiffs assert that the court possesses jurisdiction to entertain Commerce's monetary claim pursuant to 49 U.S.C. § 44309(a), as well

as jurisdiction to entertain Commerce's nonmonetary claim under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202 (2012).[1]  See Compl. ¶ 6.

### C.  49 U.S.C. § 44309

### 1. Jurisdiction

In asserting that the court possesses jurisdiction over Commerce's monetary claim, plaintiffs rely on 49 U.S.C. § 44309(a), which provides:

> (1) ACTIONS AGAINST UNITED STATES.–A person may bring a civil action in a district court of the United States or in the United States Court of Federal Claims against the United States Government when–
>
> (A) a loss insured under [chapter 443] is in dispute; or
>
> (B)(i) the person is subrogated under a contract between the person and a party insured under this chapter (other than section 44305(b)) to the rights of the insured party against the United States Government; and
>
> (ii) the person has paid to the insured party, with the approval of the Secretary of Transportation, an amount for a physical damage loss that the Secretary has determined is a loss covered by insurance issued under [chapter 443] (other than section 44305(b)).

Plaintiffs contend that section 44309(a)(1) provides for jurisdiction in the Court of Federal Claims pursuant to the Tucker Act.  Specifically, they argue that the aviation insurance program set forth in chapter 443 is a money-mandating statutory scheme because it expressly authorizes the FAA to pay claims made pursuant to the insurance policies it issues, 49 U.S.C. § 44308(b)(2), and provides for a cause of action against the government in the Court of Federal Claims when an insured loss is in dispute, id. § 44309(a)(1).  Defendant disagrees, arguing that no provision in chapter 443 requires the payment of money.  Rather, defendant asserts, chapter 443 merely "authorize[s] the payment of claims under insurance polices that may be issued by the Government, but do not establish the criteria that will determine whether such claims will be paid; the policies themselves must define those criteria."  Reply 8 (relying on Roberts v. United States, 745 F.3d 1158 (Fed. Cir. 2014), which addresses when a statute that uses the word "may" mandates the payment of money).  Neither party is correct.

---

[1] Commerce's monetary claim is captioned as a claim for breach of contract, and breach-of-contract claims against the United States for money damages normally fall within the confines of the Tucker Act.  As explained below, however, plaintiffs' breach-of-contract claims are more appropriately considered in conjunction with chapter 443.

Although the Tucker Act is the principal statute governing the jurisdiction of the Court of Federal Claims, it is not the only one. A number of other statutes waive the government's sovereign immunity and provide for jurisdiction in this court. For example, the National Childhood Vaccine Injury Act of 1986 vests the Court of Federal Claims with exclusive jurisdiction over proceedings on certain vaccine-related claims, which are defended by the government. See 42 U.S.C. § 300aa-12 (2012); accord Griglock v. Sec'y of HHS, 687 F.3d 1371, 1376 n.* (Fed. Cir. 2012). In addition, various statutes provide that copyright and patent claims against the United States may be brought in the Court of Federal Claims. See 19 U.S.C. § 1337(*l*) (2012); 22 U.S.C. § 2356 (2012); 28 U.S.C. § 1498 (2012); 35 U.S.C. § 183 (2012). See generally Zoltek Corp. v. United States, 672 F.3d 1309 (Fed. Cir. 2012) (en banc in part); Constant v. United States, 617 F.2d 239 (Ct. Cl. 1980); Hughes Aircraft Co. v. United States, 534 F.2d 889 (Ct. Cl. 1976). And, other statutes provide that certain federal tax-related claims may be brought in the Court of Federal Claims. See 28 U.S.C. §§ 1507-1508 (2012); accord Salman Ranch Ltd. v. United States, 573 F.3d 1362, 1363 n.1 (Fed. Cir. 2009); Forrester v. United States, 231 Ct. Cl. 1010, 1010 (1982). In all of these examples, Congress has waived sovereign immunity and allowed suits to be brought in the Court of Federal Claims without reference to or reliance on the Tucker Act's waiver of sovereign immunity or grant of jurisdiction. Similarly, in chapter 443, Congress has permitted the filing of civil actions in the Court of Federal Claims against the government related to aviation insurance claims, 49 U.S.C. § 44309(a)(1), thereby waiving sovereign immunity for such actions and providing for jurisdiction in this court.[2] Accordingly, it is chapter 443, and not the Tucker Act, that governs the jurisdictional grant in this matter. See also United States v. Bormes, 133 S. Ct. 12, 18 (2012) (noting that "statutory schemes with their own remedial framework exclude alternative relief under the general terms of the Tucker Act").

Nevertheless, parties seeking to invoke the jurisdiction of the Court of Federal Claims must still base their suit on a "substantive right enforceable against the United States for money damages." Testan, 424 U.S. at 398. Plaintiffs have done so here. Certainly, chapter 443 bears some similarity to the Tucker Act–in some circumstances, the determination of the government's liability might require reference to a document external to the statute, i.e., an insurance policy.[3] See 49 U.S.C. § 44309(a)(1). However, chapter 443 bears a stronger resemblance to the Contract Disputes Act of 1978 ("CDA"), 41 U.S.C. §§ 7101-7109 (2012). Similar to chapter 443, the CDA contains a provision expressly permitting a contractor who has asserted a claim against the

---

[2] The statute also confers jurisdiction on federal district courts.

[3] Based on the plain language of section 44309(a)(1), there appear to be some circumstances in which reference to an insurance policy would not be necessary. For example, under clause (B), a subrogee may bring a suit when the government has not reimbursed it for a payment it made to an insured party despite having approved the payment and determined that the loss was covered by the insurance it provided to the insured party. In these circumstances, the government's liability–and the subrogee's cause of action–is defined by clause (B), and not by an insurance policy.

government to bring a suit on that claim in the Court of Federal Claims. Id. § 7104(b)(1). The contractor's claim is based on its contract with the government; the provisions of contract, not the CDA standing alone, establish the criteria for determining whether the claim has merit. See id. § 7103(a) (discussing claims "related to a contract"). The combination of the CDA and the underlying contract provides the necessary substantive right for the contractor to pursue its claim for money damages in the Court of Federal Claims. See Quality Tooling, Inc. v. United States, 47 F.3d 1569, 1576 (Fed. Cir. 1995) ("[The plaintiff] has a colorable claim to a substantive right enforceable against the United States, a claim founded on its supply contract with the Army, and for which the CDA expressly provides a remedy."). As with the CDA, many, if not most, civil actions that are authorized under section 44309(a)(1) can only be resolved with reference to the insurance policy issued by the FAA to the insured party. Accordingly, it follows that chapter 443, in conjunction with National Air Cargo's nonpremium war risk policy, the binding contractual agreement between the FAA and National Air Cargo, supplies the necessary substantive right to money damages enforceable against the United States.

Having concluded that chapter 443 waives sovereign immunity, provides for jurisdiction in the Court of Federal Claims, and, in conjunction with National Air Cargo's nonpremium war risk policy, supplies a substantive right to money damages enforceable against the United States, the court's jurisdictional inquiry with respect to that statute is complete. As instructed by the United States Court of Appeals for the Federal Circuit, when engaging in a jurisdictional analysis, the court must determine whether the plaintiff has alleged a right to recovery premised upon a money-mandating source of law. Fisher v. United States, 402 F.3d 1167, 1173 (Fed. Cir. 2005) (en banc portion). "If the court's conclusion is that the [source of law] meets the money-mandating test, the court shall declare that it has jurisdiction over the cause, and shall then proceed with the case in the normal course." Id.; accord Jan's Helicopter Serv., Inc. v. FAA, 525 F.3d 1299, 1309 (Fed. Cir. 2008). "Only after this initial inquiry is completed and the Court of Federal Claims takes jurisdiction over the case does it consider the facts specific to the plaintiff's case to determine 'whether on the facts [the plaintiff's] claim f[alls] within the terms of the statutes.'" Greenlee Cnty., Ariz. v. United States, 487 F.3d 871, 876 (Fed. Cir. 2007) (quoting Fisher, 402 F.3d at 1172); accord Yant v. United States, 85 Fed. Cl. 264, 269 (2009) ("Subject matter jurisdiction is determined independently of analyzing whether a plaintiff might ultimately succeed on the merits.").

Although defendant's motion is framed as a motion to dismiss for lack of jurisdiction, the bulk of the arguments proffered in defendant's motion pertain to whether Commerce's monetary claim falls within the ambit of section 44309(a)(1). Plaintiffs fully responded to defendant's arguments. Because neither party would be prejudiced, the court will now proceed to consider whether Commerce can assert a claim under section 44309(a)(1). In doing so, the court converts defendant's motion, in part, to a motion to dismiss for failure to state a claim upon which relief could be granted. See Nicolas v. United States, 35 Fed. Cl. 387, 388 (1996) ("Since defendant's motion strikes at the merits of plaintiff's claim, rather than at the court's power to decide the claim, it is properly classified as a motion to dismiss for failure to state a claim . . . . Therefore, we treat defendant's motion as one to dismiss for failure to state a claim and proceed on that

basis." (citation omitted)); id. at 388 n.1 ("Because both parties have taken advantage of the opportunity to address the substantive issue of law before the court, re-classifying defendant's motion by correcting its title occasions no prejudice to either party."); see also Anaheim Gardens v. United States, 444 F.3d 1309, 1315 (Fed. Cir. 2006) ("The trial court may dismiss sua sponte under Rule 12(b)(6), provided that the pleadings sufficiently evince a basis for that action.").

### 2. Merits

To a survive a motion to dismiss for failure to state a claim upon which the court can grant relief, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  In other words, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp., 550 U.S. at 556).  In its motion, defendant argues that both the text and the legislative history of section 44309(a)(1) preclude Commerce's monetary claim.

#### a. Statutory Construction–Plain Meaning

The cardinal rule of statutory construction is that "courts must presume that a legislature says in a statute what it means and means in a statute what is says there." Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992).  Thus, when determining congressional intent, a court begins its inquiry by examining the text of the statute. Lamie v. United States Trustee, 540 U.S. 526, 534 (2004).  When the statutory language is clear, a court's inquiry is complete. Conn. Nat'l Bank, 503 U.S. at 254.

Commerce premises its monetary claim on its allegations that it issued an insurance policy to National Air Cargo, paid a settlement to National Air Cargo and its lenders under that insurance policy for the loss of the aircraft, and, pursuant to the terms of that policy, is subrogated to National Air Cargo's right of recovery under the nonpremium war risk policy issued by the FAA.  Assuming these allegations to be true, Commerce is foreclosed from pursuing its monetary claim under clause (B) of section 44309(a)(1).  The plain language of that clause reflects that it applies only to aviation insurance policies for which premiums are paid, and clearly prohibits civil actions brought by a subrogee of a party insured under a nonpremium policy, i.e., a policy issued pursuant to section 44305(b).  Plaintiffs, however, argue that Commerce is entitled to bring its monetary claim under clause (A) of section 44309(a)(1).

#### b. Statutory Construction–Ambiguity

Section 44309(a)(1)(A) provides that "[a] person may bring a civil action in . . . the United States Court of Federal Claims against the United States Government when a loss insured under [chapter 443] is in dispute."  This language is very broad; it does not require, on its face, that the person bringing the civil action be the person to whom the FAA issued the insurance policy.  Nevertheless, defendant argues, clause (A) cannot be read in isolation.  If Congress

meant for clause (A) to apply to all subrogees, defendant contends, there would have been no reason for Congress to have included clause (B), a clause governing subrogee suits, in the statute.

"It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." Davis v. Mich. Dep't of Treasury, 489 U.S. 803, 809 (1989); accord King v. St. Vincent's Hosp., 502 U.S. 215, 221 (1991) (following "the cardinal rule that a statute is to be read as a whole, since the meaning of statutory language, plain or not, depends on context" (citation omitted)).  Moreover, specific statutory provisions govern general statutory provisions, such that when a specific and a general provision exist side by side, the specific provision must be given effect, and the general provision is used only when the specific provision is inapplicable.  RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 132 S. Ct. 2065, 2071 (2012) (citing United States v. Chase, 135 U.S. 255, 260 (1890)).

As an initial matter, the parties have divergent interpretations of section 44309(a)(1)(B).  According to plaintiffs, clause (B) only governs civil actions brought by subrogees of persons insured under aviation insurance policies for which premiums are paid.  Thus, from their perspective, civil actions brought by subrogees of parties insured under nonpremium policies, such as Commerce, fall into the ambit of clause (A).  Defendant, on the other hand, asserts that clause (B) governs civil actions brought by any subrogee of a person insured under an aviation insurance policy, and then specifically excludes that subset of civil actions brought by subrogees of parties insured under nonpremium policies.  Accordingly, from defendant's viewpoint, civil actions brought by subrogees of parties insured under nonpremium policies, such as Commerce, are covered, and then excluded by, clause (B); clause (A) never applies.  Neither interpretation is textually unreasonable.  Therefore, in an attempt to ascertain the meaning of section 44309(a)(1)(B) intended by Congress, the court turns to the legislative history of the statute.  See Diamond v. Chakrabarty, 447 U.S. 303, 315 (1980) (noting that in construing a statute, a court's "obligation is to take statutes as [it] find[s] them, guided, if ambiguity appears, by the legislative history and statutory purpose"); Hart v. United States, 585 F.2d 1025, 1028 (Ct. Cl. 1978) ("Ambiguity in a statute . . . , necessitating resort to legislative history and other extrinsic aids, normally means two or more alternative readings, all having some claim to respect and none leading to absurd results.").

### c. Legislative History Assists in Resolving the Ambiguity

Prior to 1951, typical commercial aviation insurance policies excluded certain war risks, and commercial war risk insurance was "virtually useless" because its was expensive and subject to cancellation on forty-eight hours notice.  H.R. Rep. No. 82-483, at 2-3 (1951); S. Rep. No. 82-128, at 2 (1951).  Recognizing the increase in international commercial airline service and "the importance of air movement to [the country's] defense effort," Congress concluded that it was "most essential" that the government have the ability to provide war risk insurance in situations where commercial war risk insurance would be cancelled.  H.R. Rep. No. 82-483, at 3; S. Rep. No. 82-128, at 3.  Accordingly, Congress amended the Civil Aeronautics Act of 1938 to add a

program for aviation war risk insurance. Act of June 14, 1951, Pub. L. No. 47, sec. 1, §§ 1301-1311, 65 Stat. 65, 65-69. Under this program, the Secretary of Commerce was authorized to "provide insurance and reinsurance against loss or damage arising out of war risks . . . whenever it [was] determined by the Secretary that such insurance adequate for the needs of the air commerce of the United States [could not] be obtained on reasonable terms and conditions" from commercial insurers. Id. § 1302(a). War risk insurance could be provided without a premium so long as the Secretary of Defense or another agency designated by the President agreed to indemnify the Secretary of Commerce "against all losses covered by the insurance . . . ." Id. § 1304(b). Further, if there was a "disagreement as to a loss insured" under a government-issued war risk insurance policy, a "claimant" could maintain a suit against the United States in federal district court. Id. § 1310. Thus, as reflected by the purpose of the legislation and the text of the enacted statute, when the war risk insurance program was first established, there was no expectation that a commercial insurer would have any reason to bring suit against the United States because the only insurance that would have covered a war-related loss was the insurance provided by the Secretary of Commerce.

Seven years later, the war risk insurance program was reenacted, without substantial change, as part of the Federal Aviation Act of 1958, Pub. L. No. 85-726, tit. XIII, 72 Stat. 731, 800-06 (repealed 1994). The duties of the Secretary of Commerce were transferred to the Secretary of Transportation in 1967. Department of Transportation Act, Pub. L. 89-670, § 6(a)(3)(C), 80 Stat. 931, 937 (1966). The Secretary of Transportation, in turn, delegated his authority over aviation war risk insurance to the FAA. Title 49–Transportation, Establishment of Subtitles and Renumbering of Chapter I, 32 Fed. Reg. 5606, 5607 (Apr. 5, 1967) (issuing 49 C.F.R. § 1.4(b)(1), which subsequently became 49 C.F.R. § 1.47(b)).

In 1975, Congress became aware that commercial insurers were adding exclusions to their all-risk insurance policies for occurrences not covered under the definition of "war risks." H.R. Rep. No. 95-301, at 2 (1977). Consequently, it amended the Federal Aviation Act of 1958 to "expand the types of risks" that could be insured. Id. at 1; H.R. Rep. 95-773, at 1, 11 (1977) (Conf. Rep.). To implement this expansion of coverage, Congress removed all references to "war risk" from the statute. Act of Nov. 9, 1977, Pub. L. No. 95-163, §§ 1-7, 91 Stat. 1278, 1278-80; H.R. Rep. No. 95-301, at 4-9. Thus, the FAA was permitted to "provide insurance and reinsurance against loss or damage arising out of any risk from the operation of an aircraft" if the FAA "determined that such insurance [could not] be obtained on reasonable terms and conditions" from a commercial insurer and if the President determined that the continuation of the aircraft operation to be insured was "necessary to carry out the foreign policy of the United States." Pub. L. No. 95-163, sec. § 2. The provision concerning judicial review of disputed claims remained unchanged. See 49 U.S.C. App. § 1540 (1988 & Supp. V 1994).

Two decades later, in 1994, Congress revised, codified, and enacted, "without substantive change," the aviation insurance program. Act of July 5, 1994, Pub. L. 103-272, §§ 1, 6(a), 108 Stat. 745, 1167-73, 1378. Thus, the FAA retained the authority to "provide insurance and reinsurance against loss or damage arising out of any risk from the operation of an" aircraft if it

determined that the insurance could not be "obtained on reasonable terms from an insurance carrier," and if the President determined that "the continued operation of the . . . aircraft to be insured or reinsured [was] necessary to carry out the foreign policy of the United States Government." Id. § 1(e), 108 Stat. at 1168 (enacting 49 U.S.C. § 44302).  In addition, the FAA remained able to provide insurance without a premium so long as the Secretary of Defense or the head of another designated agency agreed to indemnify the FAA "against all losses covered by the insurance." Id. § 1(e), 108 Stat. at 1170 (enacting 49 U.S.C. § 44305).  And, "when a loss insured" under the aviation insurance program was "in dispute," a "person" was still entitled to "bring a civil action" against the United States in federal district court. Id. § 1(e), 108 Stat. at 1172 (enacting 49 U.S.C. § 44309).

A short time later, however, Congress revisited the substance of the aviation insurance program.  A review of the program by what was then known as the General Accounting Office ("GAO") revealed a number of problems with the program. H.R. Rep. No. 105-244, at 3 (1997). Among other issues, the GAO found that because there was not enough money in the FAA's insurance fund, the FAA might be delayed in paying a claim while it pursued a congressional appropriation, making airlines reluctant to volunteer their services for military operations. Id. The GAO recommended that Congress "[p]rovide a mechanism to ensure that there are sufficient funds available to reimburse airlines for losses that exceed the amount in the FAA's insurance fund." Id.

Congress addressed the GAO's concerns, in part, in the National Defense Authorization Act for Fiscal Year 1997, Pub. L. No. 104-201, 110 Stat. 2422 (1996).  In that Act, Congress amended title 10 of the United States Code to require the Secretary of Defense, in situations where it had an indemnification agreement with the FAA, to "promptly indemnify" the FAA for the amount of the insured loss; prompt indemnification was defined as no later than thirty days after the FAA determined the claim to be payable. Id. § 1079(a), 110 Stat. at 2667.  Because this provision concerned the Secretary of Defense's prompt indemnification of the FAA, its reach was limited to insurance issued by the FAA without a premium pursuant to an indemnity agreement with the Secretary of Defense.  The provision did not affect nonpremium insurance issued under indemnification agreements with the Secretary of State or premium insurance; however, the number of flights covered by the unaffected insurance was very small. See S. Rep. No. 105-140, at 2 (1997); H.R. Rep. No. 105-244, at 2-4, 7.  Notably, Congress did not amend the provision in chapter 443 concerning judicial review of disputed claims.

Subsequent to the enactment of the National Defense Authorization Act for Fiscal Year 1997, Congress sought to address the lack of a prompt payment mechanism for claims brought under the small number of insurance policies issued by the FAA that the Act did not address.  The solution it adopted was based on a proposal from the Secretary of Transportation.  As contemplated by the Secretary, these insured parties would obtain prompt payment insurance from a commercial insurer. S. Rep. No. 105-278, at 16-17 (1998); H.R. Rep. No. 105-639, at 47-

48 (1998).[4]  The insured party would receive payment for its claim from the commercial insurer, who would then be subrogated to the insured party's rights against the government under the insurance policy issued by the FAA.  S. Rep. No. 105-278, at 16-17; H.R. Rep. No. 105-639, at 47-48.  Then, once the FAA had sufficient funds, it would reimburse the commercial insurer for its payment to the insured party so long as the payment was for a loss covered by the insurance provided by the FAA and the FAA had previously approved the payment.  S. Rep. No. 105-278, at 17; H.R. Rep. No. 105-639, at 48.

To ensure that commercial insurers would issue prompt payment policies, the Secretary of Transportation suggested an amendment to section 44309(a), the provision concerning judicial review of disputed claims.  H.R. Rep. No. 105-639, at 11, 48.  The amendment was intended to clarify a commercial insurer's right to bring suit against the government to recover a payment that had been approved by the FAA for a loss covered by the insurance provided by the FAA.  Id.; S. Rep. No. 105-278, at 17.  Congress included the proposed amendment in the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, under the heading "Reimbursement of Insured Party's Subrogee."  See Pub. L. No. 105-277, § 110(c)(1), 112 Stat. 2681, 2681-587 to -588 (1998) (codified at 49 U.S.C. § 44309(a) (2006)).  Congress explained that the amended statutory provision, which is the current statutory provision quoted above, both "restate[d] existing law permitting an airline to sue the U.S. government when a loss insured under the war risk program is in dispute" and "add[ed] a new provision permitting such lawsuits by an insurance company when that company is subrogated to the rights of an airline and the company has paid the airline for damage to an aircraft that is covered by premium insurance under the war risk program."  H.R. Rep. No. 105-639, at 62.

The legislative history reveals that up until 1998, it was Congress's position that the judicial review provision of the aviation insurance program only permitted the party insured by the FAA to bring suit for a disputed loss.  Indeed, there was no congressional expectation that a commercial insurer would have a cause of action against the government regarding a disputed loss because the insurance provided by the FAA only covered losses that were not covered by commercial aviation insurance; no commercial insurer would have made a payment on such a loss.  It was not until the idea of prompt payment insurance was floated in 1998 that Congress sought to permit suits by subrogees.  And, recognizing that prompt payment insurance was not necessary to backstop nonpremium insurance provided by the FAA because prompt payment for that insurance was statutorily guaranteed, Congress limited its new cause of action to subrogees of parties holding premium insurance from the FAA.  In sum, the legislative history supports defendant's interpretation of section 44309(a)(1) that clause (B) precludes Commerce's monetary claim and that clause (A) should not be invoked.  Commerce's independent monetary claim under section 44309(a)(1) is therefore barred.

---

[4] Senate Report 278 and House Report 639 pertained to bills that were not ultimately enacted.  See H.R. Rep. No. 106-2, at 2 (1999).  However, as discussed below, the amendment to section 44309(a) discussed in both reports was included, without change, in a subsequently enacted appropriations bill.  Id.

### 3. Joinder

The fact that Commerce does not possess a cause of action under section 44309(a)(1) does not, however, end the court's inquiry. Section 44309 also contains a joinder provision. Under that provision, "[a]n interested person may be joined as a party to a civil action brought under [section 44309(a)] initially or on motion of either party to the action." 49 U.S.C. § 44309(b)(2) (emphasis added). The plain language of this provision reflects that any interested person may join a suit at its outset, i.e., upon the filing of a complaint. Thus, the question is whether Commerce, as National Air Cargo's subrogee, qualifies as an interested person with respect to National Air Cargo's claim against the FAA.

Chapter 443 does not define "interested person," but based on the plain language of section 44309, it is clear that an interested person must be a party other than the insured or a subrogee to a party insured under a premium insurance policy. For additional guidance, the court looks to its own permissive joinder rule, RCFC 20. That rule provides:

(1) <u>Plaintiffs</u>. Persons may join in one action as plaintiffs if:

(A) they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and

(B) any question of law or fact common to all plaintiffs will arise in the action.

RCFC 20(a). Both National Air Cargo and Commerce assert a right to relief regarding the FAA's failure to pay National Air Cargo under the nonpremium war risk policy, and there are questions of law and fact common to National Air Cargo and Commerce. Therefore, Commerce should be considered an interested person pursuant to section 44309(b)(2). It makes no difference that Commerce is not entitled to pursue a civil action on its own accord under section 44309(a)(1). See <u>Haddon Hous. Assocs., LLC v. United States</u>, 92 Fed. Cl. 8, 15 (2010) (noting that where the party contracting with the government is authorized to pursue a claim against the government and the court has jurisdiction to entertain that claim, "[t]he resulting question is purely one of joinder," not jurisdiction). But see <u>Carlson v. Glenn L. Martin Co.</u>, 103 F. Supp. 153 (N.D. Ohio 1952) ("Joinder is contingent . . . on the new party being subject to the jurisdiction of the court."). So long as National Air Cargo is entitled to pursue its claim, an interested person such as Commerce is entitled to join the suit as a plaintiff pursuant to section 44309(b)(2).[5] Accordingly, the court will not dismiss Commerce's monetary claim.

---

[5] A different result might be reached if this suit had been brought under the Tucker Act. See <u>Cienega Gardens v. United States</u>, 194 F.3d 1231, 1239 (Fed. Cir. 1998) (requiring "privity of contract between the plaintiff and the United States" for breach-of-contract claims arising under the Tucker Act). But see <u>Ins. Co. of the W. v. United States</u>, 243 F.3d 1367, 1375 (Fed.


**D. 28 U.S.C. § 2201**

Plaintiffs also contend that the court possesses jurisdiction to entertain Commerce's nonmonetary claim under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2201. Plaintiffs are mistaken. It is well settled that the Declaratory Judgment Act does not apply to the Court of Federal Claims. See Nat'l Air Traffic Controllers Ass'n v. United States, 160 F.3d 714, 716-17 (Fed. Cir. 1998). Moreover, no provision in chapter 443 expressly permits an award of equitable relief. Because there is no statutory basis for Commerce's nonmonetary claim, it must be dismissed for lack of jurisdiction. Moreover, for the same reasons, the court sua sponte dismisses National Air Cargo's claim for a declaratory judgment.[6]

**III. CONCLUSION**

As set forth above, the court possesses jurisdiction to entertain claims brought pursuant to 49 U.S.C. § 44309(a)(1). Although Commerce has failed to state a claim under that provision independent of National Air Cargo's claim, it is properly joined to this suit pursuant to 49 U.S.C. § 44309(b)(2). Commerce is a proper plaintiff in this action; the court therefore **DENIES** defendant's motion with respect to Commerce's monetary claim.[7] However, the court lacks

---

Cir. 2001) (holding that a surety for a government contractor may step into the contractor's shoes and bring suit against the United States); First Hartford Corp. Pension Plan & Trust v. United States, 194 F.3d 1279, 1289 (Fed. Cir. 1999) (enumerating exceptions to the privity rule: suits by intended third-party beneficiaries, suits by subcontractors "by means of a pass-through suit when the prime contractor is liable to the subcontractor for the subcontractor's damages," and suits by government contract sureties "for funds improperly disbursed to a prime contractor"); id. ("[T]he common thread that unites these exceptions is that the party standing outside of privity by contractual obligation stands in the shoes of a party within privity."). However, as noted above, chapter 443, which both waives sovereign immunity and vests the Court of Federal Claims with jurisdiction, is controlling in this matter.

[6] The court notes that plaintiffs' claim for a declaratory judgment would also be dismissed under the Tucker Act. Under the Tucker Act, the court may only award equitable relief in three statutorily defined circumstances. See 28 U.S.C. § 1491(a)(2) (providing the court with jurisdiction to issue, "as incident of and collateral to" an award of money damages, "orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records"); id. (providing the court with jurisdiction to render judgment in nonmonetary disputes arising under the CDA); id. § 1491(b)(2) (providing the court with jurisdiction to award declaratory and injunctive relief in bid protests). None of those circumstances is present in this case.

[7] If, during the course of discovery, information comes to light suggesting that Commerce is not an interested party under section 44309(b)(2), defendant may file the appropriate motion upon the close of discovery.

jurisdiction to entertain the parties' claim for a declaratory judgment.  Accordingly, the court **GRANTS** defendant's motion in part and **DISMISSES** this claim without prejudice.

      **IT IS SO ORDERED.**

<div style="text-align: right;">

s/ Margaret M. Sweeney  
MARGARET M. SWEENEY  
Judge

</div>